May it please the Court. Julian Poon on behalf of Plaintiff's Appellant's China Fortune Land Development and Global Industrial Investment Limited. I'd like to reserve five minutes for rebuttal. This Court should reverse the District Court's confirmation of the arbitrator's award because it can't be reconciled with basic universal contract law principles of contract formation that the arbitrator recited and then manifestly disregarded in a fundamentally incorrect and completely irrational way in excess of his authority. This case is like the Court's recent decision in Aspect, where the arbitrator dispensed his own brand of justice by breathing life into a contract the parties never agreed to, and where this Court explained that, quote, although courts play a limited role in reviewing arbitral awards, our duty remains an important one. When an arbitrator disregards the plain text of a contract without legal justification simply to reach a result that he believes is just, we must intervene, end quote. And that's precisely what this Court should do here for two primary reasons. First, there was no meeting of the minds. So the arbitrator's decision binding the parties to a nine-figure contract that was never formed was completely irrational and manifestly disregarded the law. Second, the arbitrator exceeded the authority he was given by ruling on earlier draft documents that neither side had submitted to him as the parties purported contract. At first point, there couldn't have been any meeting of the minds where neither side agreed to the contract the arbitrator purported to bind them to. Let me ask you a question about that. I'm going to change, I understand this isn't precisely what happened. But as I understand it, with respect to the, I guess I call them the November documents, it's easier to separate them by month. Your client signed most of them and then said, I authorize you to sign on our behalf the document that's really the centerpiece of this dispute. Is that fair? Not entirely, Your Honor. I would query the most. It's just by page count, we signed... I'm sorry. I'm talking by number of, I'm talking by separate documents. I wasn't adding a page count. The main document, the LPA, the Limited Partnership Agreement, it's undisputed that was unsigned by either side. But with that understanding, sure, Your Honor. But you do, you do say with respect to that document, we authorize you to sign it on our behalf, correct? We authorize you to sign the November document as it's... Right, that's it. I'm only talking about November. I understand the record. With respect to the November... On the condition that you, on the condition that they agree to and sign the November documents as they stood, if that condition was satisfied, and that's what we're talking about... Here's my problem. I just want to get the facts right, then you can make your argument. Certainly, Your Honor. Why wasn't there oral agreement to that November document? It wasn't, wasn't there, why wasn't what they said in effect an oral agreement to the terms of that November document? If they had instead said, as I hypothesized, yes, we agree to that document, why wouldn't that be a binding document? Because they never agreed to it. As the arbitrators specifically found, they, defendants, maintain that, quote, the 13 November LPAs did not reflect what had been agreed, but were rather were known and agreed to be drafts, end quote. This is right at ER 41. That's the central problem for their whole position, that they have no answer to, and they've never responded to. Where they consistently maintained and swore to the arbitrator down below, the November documents, the November LPAs, they weren't agreed to. They weren't the deal. That's not what we wanted. You have two shifts passing the next... Now I get back, now I get back to my second question. Why couldn't the arbitrator find from the record that they had effectively agreed to the November document, notwithstanding their protestations, because they sent it to you and said, here's the document. If you're okay with it, we're okay with it. That would be, because that would fly in the face of what the arbitrator found and what they argued. It's not just this one finding, Your Honor. If we look at the record, there's extensive evidence of their promising to us and are insisting in return that this condition I spoke of earlier was found. So if we look later on the page on ER 41 that I was reading from, this is evidence of the condition. The arbitrator found that, quote, the purpose of attorneys that we signed was to allow them, defendants, to sign the 13 November LPAs as had been agreed. Once that was done, both parties were to be bound, end quote. It's undisputed that was never done. Five pages earlier at ER 36, the arbitrator finds, quote, part of the offer, part of, so, end quote, based right into their offer, starting the would sign the 13 November LPAs on our, you know, behalf, end quote. At FDR 4 and 12, the same day that we signed just the SAs, the subscription agreements and the EAs, the escrow agreements, but not the LPAs, we repeatedly ask them in writing, quote, please sign the LPAs. Please sign the legal agreements that need to be signed by both parties, end quote. This is pursuant to their instructions to us on the same day at ER 22, where the instructor doesn't, don't sign the November LPAs. Quote, we'll sign the November LPAs for you. And it's undisputed, once again, that that didn't happen. And I think probably most... No, I understand. I understand it didn't happen. Let me, let me ask a broader question. Let's assume this is a really bad decision by the arbitrator. You guys signed up for you didn't want to have learned federal judges decide this case. You wanted to have an arbitrator decide this case. Let's assume it's a really bad decision. Describe for me when, when really bad slips over the line into decisions that we can turn, overturn. Because I'm having difficulty. I mean, I know, I know what the statute says, but I'm not sure. I'm not sure how, how this case slips over the line from a decision I might reverse if I were sitting on appeal to one that shows me the arbitrator manifestly disregarded his duties. But certainly your honor, I point your honor to two of this court's recent precedents, the aspect case I spoke about the beginning and the comedy club decision. In aspect, we have a completely irrational, we have a completely irrational word here, just like an aspect because the arbitral award, it fails to do its essence in the parties agreement. It isn't derived in the agreement. These are quotes from the aspect decision viewed in light of the agreement's language and context. And we know that because again, the, the findings and the evidence of the condition I spoke of earlier from the arbitrator, he finds all this. He says, look, there's this condition that has to be satisfied. They agree. And we agree. Nobody agreed to the November, uh, LPAs. And then suddenly out of nowhere, it's just this dance X matching that comes out of the sky. And suddenly he finds, Oh, there was an offer and acceptance as to something that they themselves said they didn't agree to. And they kept telling, and it's not just that they've said it. They repeatedly tried to enforce and confirm provisions found only in the December version of the LPAs, including the fee waiver and the draconian default remedies. I'm sorry. What about the judge? Thank you. What about the $80 million payment in the public announcement and the deal? I'll take them in order. Your honor, both were predicated on the assumption, uh, that the condition had been satisfied. We placed too much trust in them and assuming they keep their word when we wire the money into escrow pending, what both sides understood was the necessary finalization of the drafts. And again, keep in mind what the arbitrator found it's stamped prominently and all caps drafts right on the cover. There's dates that still need to be filled in. It's, it's not, nobody understood this to be the final agreement and sorry to, to complete my answer to judge her with his earlier question. I would point this court also to a comedy club where I think it's undisputed. The arbitrator recited basic universal contract law. We all learned as first years, and that's been in existence for centuries. This is at ER 35 and 36. You need an offer and acceptance and you need mutual assent. And then he chucks it out the window and five pages later, he just ignores that starts assuming that a contract into existence, namely the November draft. And then in totally circular reasoning, he says, and this is what they argue in their answer brief as well. They say, well, the December documents were just amendments amendments of what to call the December documents amendments is already to assume the conclusion you are the result you seek to reach. And that's really what, again, to, to crossing the line. This is, this is the rare situation where it warrants it. If you look at ER 143, it's pretty clear. The arbitrator is trying to dispense his own brand of, of private equity justice. He pretty much says, look, I'd like to force both sides to come together here and try to work out their differences. And that's not his role. He's not a mediator. He's an arbitrator. And so this case is just like aspects where the arbitrator was troubled with the notion that an Afghani counterparty could be bound by federal acquisition regulations and said, nah, I'm going to disregard that. I'm going to form a contract. Nobody, nobody agreed to, and just say there was a contract here, but forget about the federal acquisition regulations. And so this case is just like, just like aspect or, or like comedy club where the court recited California's strict laws on covenants not to compete, and then proceeded to check that out the window and apply it in a fundamentally incorrect way and have this vast overbroad injunction that basically covered 48 states and, and, and covered other relatives that, that weren't covered. I, I would like to reserve, I, I'm happy to answer the court's questions. You can, you can, let's, let's, one of my colleagues has questions. Let's let Mr. Poon reserve the rest of his time for rebuttal. Thank you, your honor. Mr. Chomsky. Good morning, your honors, and may it please the court. I'm Eric Chomsky and I represent the 1955 capital funds. Judge Hurwitz, I'd like to start with your question about the standard of review, because that obviously is critical here. The Supreme court has made absolutely clear that an arbitration award must stand. If the arbitrator quote, even arguably interpreted the party's contract, that's what the court said in Oxford health. And this court in the Collins case, put it perhaps even more bluntly, the federal arbitration act quote, does not sanction judicial review of the merits. So in Oxford health, the court simply looked at whether the arbitrator was engaged in the act of interpreting the arbitration agreement. He did. So the arbitration was upheld and that's exactly what we have here. If you look at ER 20 to 23 and 35 to 37, the arbitrator looked at the party's course of dealing. He looked at the and had been breached. And this case is utterly unlike aspic engineering in that. Let me ask you about this is what, and let's put aside for a second, whether the arbitrator's decision was correct or incorrect. I think that what troubles me in this case is that the initiation of the arbitration seemed to be about the enforceability of the December agreement. And what the arbitrator ends up with is saying, well, that that's not enforceable, but I found an earlier agreement that I'm going to enforce. And I'm not sure that was the issue he was asked to arbitrate. Can you respond to that? Sure, your honor. And there are really at least three different reasons that's not so. And let me see if I can get all of them out. So first of all, recall that the arbitrator, of course, had the November LPAs in front of him. It was just a question of whether they were attached to the initial submission. I'm not worried. I'm not worried about this. I'm not worried about the physical. I'm worried. But my point is that the dispute he was asked to arbitrate was whether or not this December document was enforceable. And what instead he did, he said, no, it's not. And then he went on to say, but there's a November document that's enforceable. So I'm wondering whether he exceeded the scope of the question posed to him by the parties. No, your honor. And that was the second point that I was going to get to. So the arbitrator was not just assessing the enforceability, you know, in a sort of thumbs up or thumbs down, yay or nay, as to particular documents. Remember that he was considering the entire course of the parties dealing here. And part of the reason he was doing that was that China Fortune, the other side, lobbed in 19 separate counterclaims, raising all manner of tort and contract duties. And in order to assess that, the only way that the arbitrator could assess that was to know what documents actually govern. And so, for instance, the arbitrator permissibly concluded that in order to determine whether the December LPA was valid and enforceable, I have to assess whether that was an impermissible amendment of the November LPA. And so in cases like Shone Duve, this court has said that even issues that are just implicitly presented are well within the arbitrator's jurisdiction to consider. But here it wasn't just implicit, it was explicit. And for that reason, Judge Hurwitz, both parties argued at length about the effect of the November LPAs. I point the court to SCR 22 and 23, where we absolutely explicitly argued in the alternative. If the December LPAs don't govern, then in the throughout China Fortunes. So where was the meeting of the minds on the November LPAs? That seems to be Mr. Poon's point here. They were marked as drafts. Where was the meeting of the minds on that document? So, Judge Brass, there are two points about this that are critical. One, the arbitrator looked at the party's course of dealing leading into the signing of the November LPA as the main document. That isn't quite right. Remember that what happened here was that China Fortune... You don't have to answer what the main document is. I was just responding to Mr. Poon's notion that when I said he signed most of them, I was talking about volume. Sure. No, but Your Honor, I say it not to quibble, but because this is substantively quite critical to Judge Brass's question. Remember that China Fortune asked for something unusual here. They said, we don't want to just go with the LPAs. What we need to do is put a lot of the meat of them into the subscription agreements. And the reason for that is they're too long and complicated, China Fortune said, for us to translate them into Chinese. And so what they said is we want subscription agreements to stand in for the limited partnership agreements. And so there's an email back from Mr. Chung, one of the principals of the funds here, to China Fortune in which he says that the subscription agreement, quote, will bind you to the appendix and LPA. And the arbitrator specifically quoted this at ER 22 and relies on it. And China Fortune at no point has addressed that. And that then gets to the second point, Judge Brass, you asked where the meeting of the minds was. The documents reflect precisely that agreement. This is laid out somewhat in the red brief at 48 to 50, and I fear that it may have been buried a bit there, but let me point you to just a couple of provisions in the agreements. The subscription agreement requires the parties to certify familiarity with the terms of the partnership agreements. That's at ER 499. And then appendix one, which is part of the subscription agreement, requires the parties to agree to comply with the partnership agreement. That's at 501. And then, and this is perhaps the most critical thing, at 506, appendix one provides that the signature agreement itself, that's in paragraph 5M. And again, at no point has China Fortune responded to that. So Judge Brass, that's a long answer to a simple question. The meeting of the minds was, we made an offer, my client made an offer and said, here are the subscription agreements and the escrow agreements. And when you sign those, you will be agreeing to the November limited partnership agreements. That is clear both from the course of dealing that the arbitrator relied on and from the documents themselves. And then they went ahead and signed those agreements. Right, but Mr. Poon would say, well, that was really just a counter offer, which you then rejected when your clients made changes to the LPA. So why don't you address that? Well, so at that point, there was already offer and acceptance. There was an agreement at that point. The agreement was, sign the essays and the EAs and the LPAs are folded into that. Remember that this is a set of interlocking agreements. And so you see, for instance, that by our account, appendix one refers to the partnership agreement. And just to be clear, the only version of the partnership agreement that's in existence at the time those signatures are affixed is the November version. Appendix one refers to the limited partnership agreement more than 40 different times. The escrow agreement refers to the partnership. But what was the December? What was the December effort then? How would you characterize your clients actions at that point? Well, so the argument was that that was our argument was that that was a permissible amendment to the agreement that constituted the subscription agreements, the escrow agreements, and the November version. And the arbitrator disagreed with us about this. And I think it's important to note here that this was not an unmitigated win for us. The arbitrator specifically said no to the December version of the agreements, but agreed with the argument and the alternative that we had made that if the December agreements weren't valid and binding that the November agreements were. And I would just add on that sort of the cherry on top, Judge Brest, is the thing that you pointed to. At the end of this, we have conduct after conduct after conduct making clear that the parties understood there was an agreement. China Fortune is a public company, and it issues a disclosure saying the board has agreed to the agreements. That's in the excerpts of record at 23 and the SER at 19. And then they go ahead and transfer 80 million dollars. Of course they understood that there was an agreement. And the idea that they were somehow duped, and that the lack of a signature on the November LPAs, in a world in which the only signature you needed was the essays, somehow fooled them into transferring 80 million dollars. Remember again that this was exactly the arrangement that they had asked for. My client said, we want you to sign the LPAs. That's what typically is done in these sorts of financial arrangements. And China Fortune came back and said, no, no, no, we need something different. We need a special setup here. We need you to make the essays, the key documents that everyone signs. I wanted to ask you one question that was raised by Mr. Poon's argument. Was the November draft, or whatever you call it, of the LPAs a document that somebody could agree to at the time? Mr. Poon says it lacked certain things, dates and other things. How do you respond to that? Absolutely, it could be, Your Honor. And it is the document that people responded to, that the parties agreed to. He points to two things. One is the lack of a signature. And for all of the reasons I've explained, that was not something that was significant to anyone. Right, I'm not worried about the lack of a signature. I'm worried about whether the document on its face is a draft that really couldn't be agreed to without other information in it. Sure, Your Honor. And that's the second thing. And the question is whether the fact that it's stamped draft as a matter of law precludes it from being legally enforceable. And the other side hasn't pointed to anything that would support that theory. No, I think we're missing each other here. Mr. Poon says it's not only labeled draft, but it's lacking some information that would have to appear for it to be the kind of document that one could agree to. And I'm not sure I saw that argument or made that argument carefully out of the briefing. Do I have that argument wrong? Were there blanks in effect for dates and things like that in the LPA? I may also be misunderstanding the argument, Your Honor. That's not what I understood them to be arguing. Okay, I'll let Mr. Poon address it when he gets back up. Right, the key argument has been because there wasn't a signature and because it was labeled draft, it can't have been something that they agreed to. But I do just want to circle back around to the standard of review here. Because obviously, we are way, way, way, way down in the weeds here. And these are arguments that a fact finder could rule on in different ways. Certainly, a finder of fact could say, I give weight to the And I think it's useful just to remember what this court has said about the extraordinary nature of the deference. So making an error, an arbitrator's error, a mere error is not enough to overturn an arbitration agreement. An internal inconsistency isn't enough. My friend on the other side has said that there was an inconsistency between what the arbitrator said about the Now, of course, the arbitrator specifically found at ER 36 to 37 and numerous other places throughout the document that there was an agreement that included the November LPAs. But even if you believe that there's an internal inconsistency there, this court held in BOSAC that that is not enough as a matter of law to overturn an arbitration award. An omission isn't enough. An ambiguity isn't enough. What you really need is what there was in a case like ASPIC engineering or in one of the similar cases like Stolt-Nielsen in the Supreme Court. In those cases, what the arbitrator does, and this is the touchstone of this sort of quaint language about an arbitrator dispensing their own brand of industrial justice. What you have to have in cases like those is the arbitrator saying there is clearly recognized law, I recognize it, and I am not following it because it wouldn't be fair. And so if you look at ASPIC engineering at page 1168, this court says the arbitrator did not base his conclusion upon ASPIC and ECC's actual past procedures, but upon his would be unjust. And that's just utterly unlike anything that we have here. What the parties bargained for was the arbitrator's decision on this issue, and the arbitrator gave the parties what they bargained for, a 147-page decision that interpreted the party's agreement. We'd ask that the court affirm if there are no further questions. Further questions from my colleagues? No, thanks. Okay, Mr. Boone. Thank you, Your Honors. Thank you, Your Honors. I'd like to make four points on rebuttal, but let me begin first with your question, Judge Hurwitz, about my position to Mr. Chomsky. Just to clarify, what I was referring to is that ER-816 and ER-879, where I believe Your Honors will see that the date is blank. It says November blank, 2015, on both covers. The cover is prominently stamped in the top right-hand corner, MORRISON & FORSTER DRAFT, all caps, 10-28-07. That's on both cover pages. And so that was what I was referring to. Okay, so the blank you were referring to in your argument was the date, correct? Correct, Your Honor. Okay, I understand now. I understand now. Okay, so there are no other missing terms other than the date? The date and it's prominently marked draft, but let me, Your Honor, speak to that. I think it addresses both the point you made, Your Honor, on the meeting of the minds and that Judge Hurwitz made on exceeding the scope, which I'd like to touch on. But I'd like to start first by saying I'm a little struck with this very simple, easy-sounding offer and acceptance story that 1955 Capitol tells now, when it's the offer and acceptance in November, when it's the exact opposite of what they had maintained throughout almost the entirety of the arbitration. Again, they kept telling the arbitrator the 13th of November. Mr. Poon, could you please refer to parts of the supplemental excerpts of record that Mr. Shumsky referred to on pages 22 and 23, where he says that the funds argued in the alternative, that if the December LPAs weren't the real contract and the November LPAs were? Yes, that didn't come up until after the hearing. Well, after the hearing, this is buried in a chart, as you'll see, where they were arguing in the alternative. Finally, once the arbitrator put forth questions after the hearing, asking, you know, how can there be a binding contract as to the December agreements when it wasn't even seen by us? We didn't see the December documents until a year later in October 2016. But I think that speaks to Judge Bress's point. The only document that was put before the arbitrators, not just a question of attachment, almost all the arbitration concerns were the December documents and the December LPAs. That was the question that was put before the arbitrator to decide. I think the court would be sending a dangerous precedent if it just allows arbitrators to rummage through earlier drafts or versions of documents and say, I can find a contract where the party said that's not the contract. Neither side said the November LPA drafts were the contract. But they did. The funds did say that. No, they didn't, Your Honor. At SER 22, that's a very different statement. It's very much more just we can go back to, it's basically asking for reformation, which they acknowledge is, and the arbitrator said, is prohibited by the agreement. This is not an argument about the validity of the November LPAs. Look at what they wrote here. The appropriate remedy would be to strike, to strike the changes in the November documents and find that the prior version of the LPAs governs. But this is not what they had maintained, not what they told the arbitrator through four rounds of pre-hearing briefing, a week-long arbitration. There wasn't a whisper or a peep of any of this. So what? People's litigant trials happen. Things develop during a trial. You should be able to talk out of two sides of your mouth and tell the arbitrator, the November drafts, we didn't agree to. Just kidding. Half a loaf is better than none. We'll take that and try to hold the China portion, which is unrepresented in this deal, hostage to a nine-figure investment obligation when we didn't know what had happened, what we were getting into. So it does exceed the scope of the court's duty, just like in the Schon-Duke case that my friend cited before, where this turned to the demand for arbitration to determine whether the parties chose to limit the scope of the arbitrator's authority, and that's precisely what happened here. And also, Judge Bress is offering acceptance of court. Again, I can't underscore the significance. They're talking out of two sides of their mouth. It's not just a question, Judge Meinerman, of arguing the alternative. Of course that happens. But I can't very well appear in your court as the fact finder and tell you two very different stories at trial and say, well, whichever one it is, as long as I can get the opposite of the other side. Mr. Poon, with respect, that happens all the time. People argue to us in the alternative and to the trial judges all the time. Now, that may exceed the scope of the arbitrable question. That's what you're arguing. But I don't think you can get very far with saying when people argue in the alternative, they've forfeited both arguments. As to the fact, if I'm saying either the light was red or green, your honor, either way, I'm not responsible for the auto accident. I can't do that, I don't think. I take your point. You've exceeded your time. So this case will be thanks to both sides for their excellent briefing and oral arguments. And we'll move on to the next case on the calendar. Thank you, your honor.
judges: Hurwitz, Feinerman, Bress